ALFRED F. JAMES V. JAMES A. CORKER ET AL., ADM'RS.

Where two mortgages existed on a tract of land belonging to the intestate, and the land was sold to satisfy the first, after which it was agreed between the administrators and the purchaser that he should extinguish both mortgages, the aggregate of which exceeded his 'bid  $6,000, in consideration whereof the administrators agreed to make the purchaser a deed immediately, instead of the deed with a twelve months' mortgage, as originally ordered, which facts being brought to the county court by the petition of the purchaser, and the deed, upon the releases of the mortgage, ordered by the court, the arrangement was within the power of the administrators and the county court, and the administrators could not be heard in the district court to assail the arrangement, on the ground that they might lose their commissions on the amount of the sale. (Paschal's Dig., Arts. 1319, 1327, 1333, 1339.)

Where property was sold upon the petition of a mortgage creditor, and an arrangement made with the purchaser whereby he extinguished that mortgage and a second, in satisfaction of his bid, the two mortgages exceeding the bid,  $6,000, the administrators were not absolutely entitled to the commissions prescribed by the statute, but to such allowance as the county court might order. (Paschal's Dig., Art. 1340, Note 502.)

APPEAL from Brazoria. The case was tried before Hon. GEORGE W. SMITH, one of the district judges.

Although the decision amounts to the statement that the *certiorari* to the proceedings of the county court ought not to have been granted, and that the decree setting aside the last action of the county court was wrongfully rendered, yet as the whole merits of the case were heard and brought up on statement of facts, the *Reporter* deems a full history of the case necessary.

At the October term, 1858, of the Brazoria county court, H. H. Williams, a creditor of the estate of Maner, filed a petition for the sale of a certain tract of land or plantation, in satisfaction of a first mortgage debt upon the same for upwards of $15,000, besides interest. At the November term the court granted the order of sale on twelve months' credit, "the purchaser required to give his note, with good personal security, for the purchase money, and a mortgage

on the land sold to secure the payment thereof; and the proceeds of said sale, or so much thereof as may remain after paying the costs of this proceeding and of the making of said sale, and the commissions of said administrators for receiving and paying out of the proceeds of said sale, or so much of said balance as may be necessary, shall be appropriated by said administrators, as soon as the same may come into their hands, to the payment of said Williams: Provided further, that if Williams became a purchaser, he should be entitled to a credit upon the amount of his bill for the sum which the administrators would be compelled to pay over to him had any other person become the purchaser."

The sale took place on the first Tuesday in January, 1859, and the appellant, A. F. James, became the purchaser. Return of sale was made by the administrators, and on 2d February it was approved and confirmed, and a conveyance ordered to be made to James upon his complying with the terms of sale.

During the same term of the county court, and on the next succeeding day, James filed his petition to the county court, in which, after reciting the previous order of sale and his purchase, he set forth that he was the assignee of the claim of Williams, and the holder of a second mortgage on the same property, as assignee of James & Ballinger, then amounting to over $14,000; that the two claims amounted to greatly more than his bid for said property; and that the *pro rata* which he would be entitled to out of the unappropriated assets of the estate upon the balance of his own claim remaining above his bid would be more than sufficient to pay the costs and expenses of sale and all costs of administration which would or could be chargeable to the fund arising from the sale, and he proposed to receipt both claims in full, provided a title was ordered to be made to him for the property.

Service of this petition was duly accepted by the attor-

neys of the administrators, and at the same term of court, February 3, 1859, the court ordered, adjudged, and decreed, "that said administrators make to said James a good and valid title to said land, with relinquishment of all claims for purchase money, upon his giving acquittance and receipt in full to said administrators for both of said claims."

On August 20, 1859, the administrators brought their suit in the Brazoria district court to obtain a *certiorari* of the foregoing proceedings of the county court, and to have the last above order set aside, the ground therefor, as stated in the petition, being, that "said estate is so largely in debt that it will probably not pay more than fifty cents on the dollar on those claims not privileged or secured by mortgage; and if the administrators are compelled to look to other funds belonging to said estate to pay the expenses of the sale of said land and their commissions on the same, amounting to near $3,000, they will not be able, in the *pro rata* division, to get more than a small moiety of their due, if they get anything at all, for the other creditors of the estate threaten to compel them to look to each particular piece of property mortgaged to pay its own expenses of administration."

They filed an amended petition, alleging that the service of James' petition in the county court had been accepted by Wharton & Terry, their general attorneys in the business of the estate, and opposition had not been made to the decree thereon, because their attorneys and the county court, in making the decree, had acted under the erroneous impression and mistake in fact that the assets in the hands of the administrators were of such an amount as would entitle James to such a *pro rata* payment on the unpaid balance of the balance which he holds against the estate as would more than compensate for the claim of plaintiffs to commission on the amount of the proceeds of sale. But that the condition of the estate was not such as was supposed by the attorneys and the court at the time the order

was made, but, on the contrary, such that, should the order be enforced, they would probably lose entirely, or in great measure, their claim for commissions on the proceeds of the sale.

The defendant, James, filed his demurrer to the plaintiffs' petition, as not showing any facts which entitled plaintiffs to relief. Also, his answer alleging that the amount for which the land was sold was less than the amount of the valid liens thereon of Williams and James & Ballinger—the only liens thereon—and duly transferred to defendants. That the other assets of the estate on which no lien of any kind existed were ample to pay the commissions of the administrators on the sale, and all expenses of administration and privileged debts; and the question in the case was, whether the commissions should be paid out of the property on which the defendant held valid liens and insufficient for their satisfaction, or out of the general assets of the estate and as against its general creditors of the fourth class. He submitted to the court the question as to the proper allowance of commissions to an administrator on a sale such as was made to defendant.

James filed an amended answer, alleging that the order or decree of the county court, made 3d February, 1859, was made as the result of an express understanding, arrangement, and agreement to that effect between the administrators and James, Maner and the wife of Corker being heirs-at-law of the estate; that the same was first suggested and proposed to him by the administrators; that defendant acceded to it, and, in order to effect and carry it out, became assignee and owner of the claims of Williams and of James & Ballinger, assignees of Doswell, Hill & Co., on terms and for a consideration he would not have done otherwise, and had been placed in a position by the agreement that its revocation, and a decree based thereon, would be a serious loss to him and a fraud upon him; that if true, the administrators made a mistake in regard to the amount of

assets of the estate, it was their own error and fault, and owing to their own carelessness and negligence, the means to know the precise truth being in their own hands, and was without suggestion, fault, or act of defendant, who in no manner caused the same or misled them.

Defendant further alleged, on information and belief, a sufficiency of other assets chargeable, in law and equity, with the payment of administrators' commissions; but whether this was so or not, plaintiffs should not be permitted to mislead defendant, cause him to buy up and pay for the claims, and incur liabilities therefor he would not have done except on the basis of the agreement and decree.

Defendant prayed and insisted, that the administrators be compelled to make the deed in accordance with the decree of 3d February. If the court did not do this, (reserving all right of exception and appeal,) that defendant should have the alternative right to pay the further amount necessary; and that the *pro rata* on the excess of the claims of James & Ballinger, assignees, be applied to; or, if not paid by a given day, that the plantation be resold. Also prayed for general relief. A jury was waived, and the case was submitted to the court.

The administrator proved the transcript of proceedings in the county court.

They then introduced Clinton Terry as a witness, who testified that his law firm, Wharton & Terry, were attorneys of the administrators in the proceedings and business of the estate in the county court; that at the time of the sale of the Maner plantation the defendant, residing at Galveston, sent a messenger, requesting Wharton & Terry to buy it in for him. Witness told the administrators, who were present at the sale, of said letter, and, with their knowledge and assent, acted as agent for James, and was the highest and best bidder, in the name of James, at the price of $28,000 75. After the sale witness and administrators talked over the condition of the estate, its assets, &c.,

the debt of Williams, which was the prior lien on the plant-
ation, and the debt of James & Ballinger, assignees, which
was the second lien on the same, and would have amounted,
at the maturity of the bid, to about $34,000, $6,000 more
than the bid; and it was concluded by witness and the admin-
istrators that if Mr. James could be induced to get the Wil-
liams debt, and to release that and the James & Ballinger
debt, both in full, for the property, it would be a good thing
for the estate. They supposed at the time that the assets of
the estate would be of such an amount that the *pro rata* share
thereof of the overplus of $6,000 would more than equal
the commissions to which the administrators were entitled
on the sale to James. After conversation, and an under-
standing to that effect with the administrators, witness
wrote to Mr. James, and inquired of him whether he would
be willing to get the Williams and James & Ballinger claims,
and release them in full to the estate for a clear title to the
property. He replied that he would. Witness then sent
him a form of application, to be made to the county court,
to obtain authority for that arrangement. He transmitted
the same to witness, as his petition to the court now appears,
substantially as witness enclosed it to him.

Witness acknowledged service for the administrators, and
the order was made upon his explanation of the same to
the county court. The administrators understood the order
fully. Witness acted, after consultation with them, in com-
pliance with their wishes, and after it was made they were
fully aware of it, and it was with their approval. But both
they and witness supposed at the time that there would be
a sufficiency of general assets of the estate on which there
was no lien for the *pro rata* share thereof of the excess of
the James & Ballinger debt, over and above the amount
of James' bid, to more than equal the commissions of the
administrators on said sale. Witness notified Mr. James
of the order of the county court. Witness understood
afterwards some trouble arose between him and Williams

with regard to the transfer or release of Williams' debt. Witness thinks it was not until August Mr. James, and also Judge Jones, the attorney of Williams, notified witness that the matter was settled between Williams and James, and requested witness to get the deed signed by the administrators and bring it to Galveston, so that on the delivery thereof, and on the release of the claims, James should execute a mortgage to Williams for the remainder for which he transferred his debt after the cash payment agreed on.    Witness prepared a deed and sent it to the administrators for execution by them.    They replied to the effect that the assets of the estate would not turn out as much as they had anticipated, and they refused to sign the deed and carry out the arrangement, and requested proceedings to obtain their commissions out of the proceeds of the sale. Witness did not act as attorney or agent for James further than to make the purchase for him at the date of sale.   In the remainder of the transaction witness acted as attorney for the administrators, and with their assent; but on account of his connection with the matter he declined to bring this suit.

The purchase by James of the mortgage claims of Williams and James & Ballinger, and his having made cash payment in part to Williams, was admitted.  It was further admitted that the general assets of the estate, over and above privileged claims or heirs of any kind, and for payment of fourth-class creditors, (subject to the questions of commissions in this case,) realized in the hands of the administrators, now in cash, or beyond doubt good, amounted to above $3,700, and the debts of the fourth class to about the sum of $27,000.  It was further admitted that a suit was pending in which the administrators of Maner, the heirs of Maner, and all the creditors of Maner are parties, in which creditors seek to make a large fund liable to their debts upon failure of the admitted assets of the estate; and the heirs claim said fund as a trust fund

for them, not liable to the debts, which fund is amply large to pay all the allowed and approved claims against Maner's estate.

The judgment of the district court was, that the judgment of the probate court of Brazoria county, rendered February 3, 1859, be annulled and set aside, and the petition of James, in the probate court, in which the judgment was rendered, be dismissed, and the clerk certify that judgment to the probate court for observance.

*Ballinger & Jack*, for appellant.—I. It clearly appears that the amount of the two mortgage debts exceeded the amount of the sale of the mortgaged property by more than $6,000; that the administrators had in hand cash, or beyond doubt good assets, over and above privileged claims or liens of any kind, about $3,700.

[They cited and commented upon sections 54, 55, 59, 78–81, of the probate law.  Paschal's Dig., Arts. 1314, 1315, 1319, 1339, 1340, 1341, 1342.]

These are believed to be all the sections of the statute specially applicable to the subject; and from them it clearly results that all the expenses of administration and the debts by mortgage, so far as the latter can be paid out of the mortgaged property, are to be paid before there can be any payment of the creditors of the fourth class; and whilst it is true, that if there is no property except mortgaged property, the administrator is entitled to payment of expenses of administration out of it, in preference to the mortgage creditor, yet there is not the slightest foundation in the law, in the reason or justice of the case, that the mortgage debts should not be paid to the extent of the entire proceeds of the mortgaged property, (being less than the mortgages,) and the expenses of administration be paid out of the other assets not chargeable or affected with any lien.

The expenses of administration and the liens by mort-

gage are both to be paid before any payment to general or fourth-class creditors; the latter to be paid, in the express language of the 78th section, "so far as the same can be paid, out of the proceeds of the property subject to such mortgage or lien," and by the express language of the 81st section, "or so much thereof as may not be required for the payment of any debts against the estate that have a preference over such mortgage;" and no clause or sentence in the statute or elsewhere justifies the idea that commissions are specifically to be deducted from such proceeds.

The expenses of administration are not a lien or charge upon any particular property of the estate, but are a preference debt against the whole estate; their entire amount is to be estimated by the administrator in writing, and property is to be sold and collections made in order to pay them. (Paschal's Dig., Art. 1314.)

No rule in equity is better settled or more familiar than that, if A can obtain satisfaction of his debt from two pieces of property, and B from only one of them, B can require A first to exhaust the property on which B's lien does not bear, before he can come on the property subject to B's lien. (1 Story, Eq., §§ 559, 633, and references.)

This doctrine is particularly applicable to the administration of estates and the marshaling of assets, in paying its debts in their proper order; and it is equally repugnant to our statutes and to the general doctrines of equity that an administrator should sell property subject to a mortgage or appropriate any of its proceeds to pay any of the first or second-class debts, to the exclusion of any part of the mortgage, when there was property unencumbered by any lien out of which those debts could be paid. (1 Story, Eq., §§ 558, 633, and references.)

In Chandler v. Burdett, 20 Texas, 44, the court said: "The law disregards their lien (mortgages) so far as it may be necessary to secure the payment of the two first classes of liabilities. Beyond this, it preserves the lien to be en-

forced under process from the county court. (Lockhart v. White, 18 Tex., 108.)

II. The administrators showed no ground which entitled them to set aside the arrangement and agreement they had made, resulting in the order of 3d February.

The only excuse for it is, that they were mistaken in supposing that the general assets of the estate were of an amount that the overplus of the mortgaged debts above the mortgaged property, $6,000, would obtain a *pro rata* out of the general assets equal to the amount of their commissions. (1 Story, Eq., § 146, 151; Swenson v. Walker, 3 Tex., 93; Johnson and Wife v. Chubb, 11 Tex., 469; Eccles v. Daniels, 16 Tex., 139, 140; Hall v. Hall, 11 Tex., 526, 533, *et seq.;* Jones v. Underwood, 11 Tex., 119; Smith v. Smith, 11 Tex., 102; Guthrie v. Guthrie, 17 Tex., 543.)

III. Objection is made by the administrators to the want of authority in the probate court to make the order of 3d February. But this is without foundation. The probate court can sell mortgaged property "on such terms as the chief justice may direct." (Paschal's Dig., Art. 1322.)

Such arrangement was fully within the province of the administrators themselves, and was inherent in their power of collection. It did not require the order of court, but could have been made and carried out by the administrators, and would have fully bound them. But it will be borne in mind that the two orders of the court, at the February term, were for the same purpose, and to carry into effect this arrangement.

Even where the terms of sale are not pretended to be complied with or carried out, but the administrators and purchasers make arrangements outside of the law, they are bound by them. (Allen v. Atchison, 26 Tex., 616, 628.)

If there was want of authority in the probate court, the district court, having possession of the case, would compel the administrators to perform their agreement and do

what is equitable under the circumstances.    (Robertson v. Paul, 16 Tex., 472.)

IV. The court has decided that where the terms of a sale are not complied with, in order to bind the purchaser, even where he is in fault, a resale must take place in reasonable time, and that from January to October was not reasonable.

In this case the purchaser was in no fault.

V. The point is further submitted, that the administrators were not entitled to the commissions they claim of ten per cent. on the total amount of the bid.

The statute only allows five per cent. on cash actually received, and the same per cent. on cash actually paid out.

There is no pretense, of course, that this was done.    It was a proper exercise of discretion by the court to carry out the agreement of the administrators and purchaser, which saved the administrators from the necessity of this collection and disbursement; and their claim is not the statutory one for commissions, but is for proper and equitable compensation for the services rendered.

The whole proceeding is prejudicial to the estate, and in bad faith by administrators.

*Lathrop & McCormick*, for appellee.—I. It is contended by the appellees that, the probate court having ordered the sale of the land on a credit of twelve months, the purchaser to give note with good personal security and a mortgage on the premises sold, to secure the payment of the purchase money, the land having been sold in accordance with the decree, and the administrators having reported the sale, and the court having approved the same, and ordered title to be made to the purchaser upon his complying with the terms of the sale as ordered, had no right or authority to alter or reverse the decree, ordering the administrators to make title to the land to the purchaser on different terms than was originally ordered.    And even in

the first instance, if the probate court had ordered the sale on different terms, except so far as to pay the debt of H. H. Williams, from what it did, it would have been error. The probate court has no option but to order the sale of lands on a credit of twelve months, the purchaser to give security on the property sold, and personal security, except to satisfy the mortgaged land. (O. & W. Dig., Arts. 775–782; Wood & White v. Wheeler, 11 Tex., 122.) When a sale is reported, the only authority the probate court has in the premises is, either to approve or reject the sale. They have no authority to order it to be confirmed on different terms than it was ordered. After the confirmation of the sale the administrators and their bondsmen are responsible for the compliance with the terms. The court has nothing to do with it. (O. & W. Dig., Art. 780.) The probate court, being a court of limited jurisdiction, has no authority to make any order or decree which it is not expressly authorized by statute to do. (6 Tex., 185.).

By a careful consideration of section 79 of the probate law (Paschal's Dig., Art. 1340) it will be clearly seen that the legislature intended that the administrator should take from the particular money that passed through his hands their commissions.

II. Although the order made on the 3d day of February, 1859, appeared to conclude the transaction between James and the administrator of William Maner, deceased, the whole testimony of the witness, Terry, goes to show conclusively that it was not closed, but was in fact pending, James not being in condition to close it until sometime in August. It also appears from the testimony of the same witness that it was not in the mind of any of the parties to the transaction that the administrators should lose their commissions.

Morrill, C. J.—In 1858 H. H. Williams, a creditor of the estate of William Maner, deceased, and having a mort-

gage on a certain tract of land, to secure the debt obtained an order of the county or probate court to have the mortgaged property sold and the proceeds of the sale applied to the payment of the debt; sale to be on a credit of twelve months.

At the sale James purchased the land for $28,000 75. The sale was confirmed at the court succeeding the same, and during the same term of the court, at the instance of said James, and concurred in by the administrators of the estate of the deceased, the court ordered, adjudged, and decreed, " that the administrators make to said James a good and valid title to said land, with relinquishment of all claim for purchase money, upon the giving by him an acquittance and receipt in full to the administrators for the mortgage of Williams for $15,000 and upwards, besides interest, and a second mortgage on the same land, founded on a claim due Ballinger & James for upwards of $14,000."

It seems to be admitted that the estate, by this order of the court, based upon an agreement of James and the administrators, would save some $4,000, being the excess of the amount due on the two mortgages over the sum for which the land was sold.   It also seems that the estate was insolvent, and would not pay more than 50 per cent. on the unprivileged debts.

Subsequently the administrators instituted a suit in the district court for the purpose of setting aside the order of the county court, assigning as a principal reason therefor that their fees, as such administrators in the settlement of the mortgages, would amount to some $3,000, and that they were entitled to receive the same from the proceeds of the sale of the mortgaged property, and that the property of the estate is not liable to pay their fees.

The district court set aside the judgment of the county court, and entered a judgment substantially in conformity

with the request of the administrators, and the cause is brought for revision to this court.

The counsel on each side have argued the cause very elaborately, but our view of it will enable us to decide it in few words.

As James was the assignee and possessor of the two mortgage debts, which, in the aggregate, exceeded by several thousand dollars the value of the land, as ascertained by public sale, even upon a credit of twelve months, and as he was the purchaser of the land, and entitled to it upon complying with the conditions of the sale, and as he not only virtually did this, but, what is more, did in one day what he had the privilege of twelve months in doing, viz, satisfying the claims of the mortgagees, no valid reason can be assigned why the county court should not make the order it did.

It might have operated to the detriment of the administrators of Jones thus acting, and by not paying the money as purchaser of the property, to the administrators, in order that they might immediately hand the same back to him, saving five per cent. for receiving it, and the same for handing it back; but as the statutes are not made to benefit the administration of estates, but the estates themselves and their creditors, it was the duty of the county court to avoid this expense. And as the administrators did not receive the money or pay it out, they are not entitled to the $3,000 for which their suit was brought.

It is competent for the county court to make such allowance for their service as may seem just. The demurrer should have been sustained.

It is ordered that the judgment of the district court be reversed, leaving the order of the county court to stand as it was, and that the appellees, in their individual capacity, pay all costs herein and in the district court expended.

REVERSED AND DISMISSED.